Judgment rendered May 10, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,030-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

ISAAC THOMAS GEE                            Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 16-F-002256

Honorable Frederick D. Jones, Judge

* * * * *

JOHN D. & ERIC G. JOHNSON
LAW FIRM, LLC                               Counsel for Appellant
By: Eric G. Johnson
    Rachel W. Bays

ROBERT S. TEW                               Counsel for Appellee
District Attorney

SHIRLEY M. WILSON-DAVIS
Assistant District Attorney

* * * * *

Before PITMAN, COX, and MARCOTTE, JJ.

MARCOTTE, J.

This criminal appeal arises from the Fourth Judicial District Court, Parish of Ouachita, the Honorable Frederick D. Jones presiding. Defendant, Isaac Thomas Gee, was convicted of second-degree murder, in violation of La. R.S. 14:30.1. Defendant was sentenced to life imprisonment, to be served without the benefit of probation, parole, or suspension of sentence. Defendant now appeals his conviction, as well as the trial court's decision to allow his booking photo to be used at trial for purposes of identification. For the following reasons, we affirm defendant's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

Following a traffic stop on Interstate 20 westbound late in the morning of August 22, 2016, Issac Gee fled from his vehicle on foot and led officers on a chase through a brickyard and a wooded area near the interstate. Gee was spotted leaving the scene of the gruesome, execution-style killing of Laquintina Qualls in the bathroom of the Central Gas Station located in West Monroe, Louisiana. Defendant was finally apprehended and taken into custody following the manhunt.

On October 14, 2016, Gee was charged by bill of indictment with the second-degree murder of Ms. Qualls, in violation of La. R.S. 14:30.1. A 12-person jury was impaneled on January 25, 2022, and a four-day trial commenced. On January 26, 2022, the state filed a motion *in limine*, arguing that defendant's "tidying up" for trial had completely altered his appearance and would taint the ability of witnesses to identify him at trial. The state asserted that defendant's "tidying up" consisted of shaving his head and beard, and that defendant lost a considerable amount of weight since the incident five years before. The state sought to use defendant's

booking photo as a way to depict what he actually looked like at the time of the offense.

On January 27, 2022, defendant filed a motion *in limine* and a motion to suppress the mugshot photograph, arguing that the use of a single booking photo for purposes of an in-court identification would be unduly suggestive and presented a substantial likelihood of misidentification. A hearing was held and the trial court, citing *U.S. v. Carillo*, 20 F. 3d 617 (5th Cir. 1994), granted the state's motion *in limine* and denied defendant's motion to suppress.

The state's first witness was Shendra Briggs. Ms. Briggs grew up in the same household as Ms. Qualls and thought of her as a sister. She stated that Ms. Qualls was 24 years old with a one-year-old daughter and that she worked full-time as a certified nurse assistant at Rayville Nursing and Rehabilitation Center while simultaneously studying at Delta Career College to become a registered nurse. Ms. Briggs stated that Ms. Qualls and Gee dated off and on since high school, but that at the time of her death, Ms. Qualls was married to Diontavius Walker, who lived in Houston. She described the relationship between Ms. Qualls and Gee as "crazy love" and "very toxic."

At the time of Ms. Qualls' death, Ms. Briggs stated that she, along with her mother and her two children, was living with Ms. Qualls and Ms. Qualls' daughter in a one-bedroom apartment in Rayville, Louisiana. Ms. Briggs stated that on the day Ms. Qualls was murdered, she saw defendant walking around their apartment complex "look[ing] strange." Ms. Briggs testified that she had repeatedly observed defendant hiding or asleep in the backseat of Ms. Qualls' Chevrolet Impala, without Ms. Qualls' consent. Ms.

2

Briggs was shown a photograph of Gee and confirmed that he appeared that way on the day of the murder. She also identified him in the courtroom.

On the night before Ms. Qualls was murdered, Ms. Briggs said that her phone went dead and she needed to make a call, so she went into Ms. Qualls' room to use her cell phone instead. In the process of using Ms. Qualls' cell phone, she noticed that Gee had attempted to contact Ms. Qualls numerous times via text messages and phone calls. Ms. Briggs noted that Ms. Qualls had Gee's phone number saved to her phone under the name "crazy love."

When she woke up the next morning, Ms. Briggs said that she did not see Ms. Qualls, but that was of little concern to her because she knew Ms. Qualls' nursing shift began early in the morning. Later that morning, Ms. Briggs was informed that Ms. Qualls had been murdered in a gas station bathroom.

Sheila Hales was Ms. Qualls' supervisor at the Rayville Nursing and Rehabilitation Center and was the last person to talk to Ms. Qualls before she was killed. When Ms. Hales arrived at work on the morning of August 22, 2016, she noticed Ms. Qualls was not there like she normally was so she called her. When Ms. Qualls didn't answer, Ms. Hales stated that she informed Ms. Briggs' family because she "felt like something was bad wrong." Ms. Hales stated that Ms. Qualls eventually returned her call but could only say, in a scared voice, "165 Bastrop/Columbia gun to my head," before the phone went dead.

Ms. Hales testified that she immediately called the sheriff's office in Rayville, Louisiana, to inform them of the startling call she had just received. After several more unsuccessful attempts to contact Ms. Qualls,

3

Ms. Hales eventually received another call from her. During this phone call, Ms. Hales stated that she could hear a scuffle and a gunshot before the phone went dead. Ms. Hales stated that she then went to the sheriff's office and gave a written statement of her account. Ms. Hales' written statement was admitted into evidence.

Patricia Foster is a cashier at the Central Gas Station where Ms. Qualls was murdered. From her position behind the cash register, she recalled seeing "a man and a lady" enter the store that day and proceed to the bathroom. Ms. Foster stated that she heard yelling coming from the bathroom and a few seconds later heard gunshots. After hearing the gunshots Ms. Foster testified that she immediately took cover outside of the store before calling 911.

Travis Ray is an officer with the U.S. Fish and Wildlife Service and was inside the Central Gas Station when the shooting occurred. Mr. Ray testified that he routinely stopped at the Central Gas Station, off of the Cheniere Drew exit on Interstate 20, to get a slice of pizza. Mr. Ray said that while he was standing at the cash register he saw, through his peripheral vision, a man and a woman enter the women's bathroom. He said he then heard screaming coming from the women's bathroom area quickly followed by four gunshots. Mr. Ray said he then immediately went outside to take cover behind his car in the parking lot. As he was running toward his car, he saw a black male wearing a black shirt exit the store, and while positioned behind his car, he saw the same man climb into a white Chevrolet Impala parked in front of the store.

When the man reversed the car to exit the parking lot, Mr. Ray said he got a clear view of him and testified that he had a "crazy, enraged look" in

4

his eye. Mr. Ray then recorded the license plate number of the white Impala and called the sheriff's office with that information. He also informed the sheriff's office that the white Impala was headed west on Interstate 20. Mr. Ray was able to identify Gee in the courtroom as the same man he saw exit the store and drive off in the Impala on the day of the shooting. Mr. Ray was shown video surveillance footage and photographs taken from the store that day which confirmed his account and which were admitted into evidence.

Matthew Nolin was employed as a maintenance worker by Central Gas Station and was in the store changing lightbulbs on the day of the shooting. While in the store, Mr. Nolin said he heard a woman yelling "at the top of her lungs" from the bathroom area followed by a series of gunshots. After hearing the gunshots, Mr. Nolin said he saw a black male in a dark shirt walk out from the bathroom area, stop to look at everybody, then walk out the front door. He said he then saw a white car drive off from the store. After seeing the white car drive away, Mr. Nolin said he opened the stall door in the women's bathroom and found Mrs. Qualls lying hunched over on the floor with "blood everywhere." Mr. Nolin was shown a photograph, which was admitted into evidence, of the gruesome scene he encountered when he opened the stall door, and he confirmed that it showed what he saw that day.

Corporal George Canales ("Cpl. Canales") works in the patrol division with the Ouachita Parish Sheriff's Office and was one of the first officers at the Central Gas Station after the shooting. Cpl. Canales arrived to find a "pretty chaotic" scene and quickly began to secure the area and take witness statements. From the surveillance video Cpl. Canales was able to

5

view at the store, he saw a white Chevrolet Impala pull into the parking lot, a black male and female get out and come inside the store, then only the male leave in the same Impala.

Sergeant Johnny Holyfield ("Sgt. Holyfield") is a patrol officer with the Ouachita Parish Sheriff's Office who responded to the crime scene on August 22, 2016. When Sgt. Holyfield arrived on the scene, he said he entered the women's bathroom and found Ms. Qualls lying on the floor in one of the stalls with gunshot wounds to the head. Sgt. Holyfield was shown a series of pictures admitted into evidence depicting the crime scene and he confirmed the pictures showed what he saw that day.

Renee Smith was the crime scene coordinator for the Ouachita Parish Sheriff's Office at the time of the incident. She testified concerning her analysis of the crime scene. Ms. Smith analyzed the women's bathroom stall where the shooting occurred and found that Ms. Qualls suffered multiple gunshot wounds to the head. Ms. Smith said that she observed brain matter on the top of Ms. Qualls' hair, as well as blood dripping from her face and the top of her head. Ms. Smith stated that she noticed a cell phone positioned behind Ms. Qualls' body. She said she also found a bullet hole in the wall directly behind Ms. Qualls' body with high velocity blood splatter around the hole. Ms. Smith was able to retrieve the bullet from the hole and she confirmed that the bullet admitted into evidence was the same one she retrieved from the hole in the wall on the day of the incident. Ms. Smith testified that the absence of shell casings recovered from the crime scene led her to believe that a revolver was used in the killing of Ms. Qualls.

Jonathan Chapman is a trooper with the Louisiana State Police. On August 22, 2016, he was traveling eastbound on Interstate 20 near Ruston,

Louisiana, when he received an announcement to be on the lookout ("BOLO") for a white Chevrolet Impala headed westbound on Interstate 20. Trooper Chapman then saw a vehicle matching that description and turned around to catch up to it and pull it over. Once he was able to verify the license plate number announced on the BOLO, he said he activated his lights to initiate a traffic stop. Trooper Chapman testified that when the driver of the white Impala pulled over to the side of the interstate and exited the vehicle, he saw a chrome handgun in the driver's right hand.

Trooper Chapman said that he then saw the driver throw an object under the car and take off running in a northerly direction. Trooper Chapman described the driver as a black male wearing a black shirt. He and another state trooper then chased the suspect on foot through the Ruston brickyard near the interstate, where they eventually lost sight of him. Trooper Chapman radioed for backup and returned to the white Impala to secure it for the crime scene investigators. After the suspect was apprehended and returned to the Impala, Trooper Chapman saw him and recognized him as the same man he saw exit the vehicle and flee on foot. Despite seeing the suspect throw what appeared to be a handgun under the car before running away, Trooper Chapman testified that no handgun was recovered from under the car.

Sergeant Justin Stephenson ("Sgt. Stephenson") is a patrol officer with the Louisiana State Police. On August 22, 2016, he was traveling on Interstate 20 when he spotted a white Chevrolet Impala that matched the description on the BOLO announcement. Sgt. Stephenson said he radioed the location of the Impala to Trooper Chapman, who initiated the traffic stop. Sgt. Stephenson testified that he then saw a black male wearing a

7

black shirt exit his vehicle with what appeared to be a chrome handgun in his right hand. He said he then gave chase when the black male fled the scene on foot northbound up a hill. Sgt. Stephenson testified that he and other officers eventually apprehended the man near a wooded lot close to Interstate 20. Sgt. Stephenson identified Gee in the courtroom as the same man he saw exit the white Impala that day.

Lieutenant Cody Custer ("Lt. Custer") works for the Ouachita Parish Sheriff's Office and was part of the team of officers that apprehended Gee on the day of the incident. Lt. Custer testified that he tackled Gee when he saw him running out of the woods near Interstate 20 and found live revolver ammunition on him. Lt. Custer then identified Gee in the courtroom as the same man he apprehended that day.

Dr. Frank Peretti, accepted as an expert in forensic pathology, performed an autopsy on Ms. Qualls. Dr. Peretti stated that her cause of death was three gunshot wounds – one above her left eyebrow and two to the back of the head – at close range. Dr. Peretti noticed stippling above the victim's left eyebrow, indicating the gun was fired three to five inches from Ms. Qualls' head. Dr. Peretti testified that any one of the three shots fired at Ms. Qualls would have been fatal. Dr. Peretti's autopsy report detailing his findings was admitted into evidence.

Brian Boney was an investigator with the Ouachita Parish Sheriff's Office at the time of the incident. Mr. Boney interviewed witnesses at the Central Gas Station before traveling to see Gee once he had been taken into police custody. Mr. Boney identified Gee in the courtroom as the same man he saw in police custody on the day of the incident.

8

Officer Darrell Johns ("Off. Johns") is an officer with the Ouachita Parish Sheriff's Office who stayed with the white Impala on the side of the interstate while other officers chased down Gee on foot. Off. Johns stated that he secured the area around the vehicle, inspected it, and found what appeared to be blood droplets on the steering wheel and the driver's side door panel. Off. Johns was shown a series of photographs of the Impala and confirmed that they depicted the same vehicle he secured on the day of the incident.

Officer Christopher Thirdkill ("Off. Thirdkill") is a patrol supervisor with the Morehouse Parish Sheriff's Office. Off. Thirdkill took the 911 call from Ms. Qualls on the day of her murder. Off. Thirdkill testified that at 8:52 a.m. on August 22, 2016, a female called 911 and stated she was at the E-Z Mart in Bastrop, Louisiana. Off. Thirdkill noted that she said a man had a gun and that she seemed in distress.

Sergeant Michael McClain ("Sgt. McClain") is an investigator with the Ouachita Parish Sheriff's Office assigned to the violent crimes unit. When Sgt. McClain arrived at the crime scene, he began reviewing surveillance video footage from the store before and after the shooting. The surveillance video was played for Sgt. McClain in court and he explained what it showed. Sgt. McClain testified that the video showed a white Impala pull into and park in a spot in front of the Central Gas Station; Ms. Qualls exited the vehicle from the driver's side and Gee exited from the passenger side. He said the video then showed Ms. Qualls walking with a limp inside the store while Gee was behind her in an escort position. Approximately one minute later, Sgt. McClain testified that the video showed one customer fleeing from the store before Gee came out of the store alone and climbed

9

into the driver's seat of the Impala. Sgt. McClain also testified that he retrieved a 911 call from the Morehouse Parish Sheriff's Office. In the 911 call, Sgt. McClain said that he heard Ms. Qualls state that she was at the E-Z Mart in Bastrop, Louisiana. He heard Ms. Qualls say that defendant was pumping gas, and he heard her repeatedly ask for help. The state rested following Sgt. McClain's testimony.

The defense then called its first and only witness, Lieutenant Miranda Rogers ("Lt. Rogers"). Lt. Rogers is an investigator with the Ouachita Parish Sheriff's Office. On the day of the incident, she interviewed the store manager, Winona "Sue" Hayden, who told her that she saw a black male wearing a black shirt in the woman's bathroom with Ms. Qualls. Lt. Rogers' interview with Ms. Hayden was recorded, and after defense counsel played the interview for the jury, defense counsel tried to elicit testimony from Lt. Rogers that Ms. Hayden had actually told her that the assailant was wearing a white shirt. Lt. Rogers, however, maintained that she heard Ms. Hayden describe the assailant as a black male wearing a black shirt. The state noted that Ms. Hayden was unable to testify at trial due to health issues. The defense rested following Lt. Rogers' testimony.

On January 29, 2022, after a one-hour deliberation, the jury returned a unanimous verdict of guilty as charged to second-degree murder, and the trial judge ordered a presentence investigation report. On April 5, 2022, Gee was sentenced to mandatory life imprisonment without benefit of probation, parole, or suspension of sentence. Gee now appeals.

10

**DISCUSSION**

Sufficiency of the Evidence

Appellant argues that there was insufficient evidence presented at trial to convict him of second-degree murder. When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Hearold*, 603 So. 2d 731 (La. 1992). Appellant's argument is that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact would not have concluded that the state proved the essential elements of the crime beyond a reasonable doubt. Appellant asserts that there were discrepancies in the testimony and a lack of direct evidence placing him in the women's bathroom at the time of Ms. Qualls' murder. Appellant's position is essentially that the circumstantial evidence presented at trial did not exclude every reasonable hypothesis of his innocence. Defendant asks that his conviction be overturned and his sentence vacated.

The state argues that the evidence presented at trial overwhelmingly supports defendant's conviction for second-degree murder. The state asserts that, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact would have easily concluded that the state proved the essential elements of second-degree murder beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of defendant's innocence. The state points out that the video surveillance from the Central Gas Station supports the witness testimony that Gee and Ms. Qualls entered the store and went into the women's bathroom together, that screaming was heard followed by four gunshots, and that Gee then left the store and drove off in

11

Ms. Qualls' vehicle before finally being taken into custody after a manhunt near Interstate 20. The state asks this court to affirm Gee's conviction and sentence.

The Louisiana Supreme Court has set forth the following standard of review of the sufficiency of the evidence:

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d. 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 00-0674, (La. 6/29/01) 796 So. 2d 649, 657, *citing State v. Captville*, 448 So. 2d 676, 678 (La. 1984).

*State v. Brown*, 03-0897, p. 22 (La. 4/12/05), 907 So. 2d 1, 18.

Evidence may be either direct or circumstantial. *State v. Jacobs*, 07-887 (La. App. 5 Cir. 5/24/11), 67 So. 3d 535, *writ denied*, 11-1753 (La. 2/10/12), 80 So. 3d 468. We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams*, 33,881 (La. App. 2 Cir. 9/27/00), 768 So. 2d 728, *writ denied*, 00-99 (La. 10/5/01), 798 So. 2d 963, *citing State v. Sutton*, 436 So. 2d 471 (La. 1983). Circumstantial evidence is where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id*. Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438.

In *State v. Chism*, 436 So. 2d 464, 469 (La. 1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

12

Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. *State v. Fontenot*, 14-835 (La. App. 3 Cir. 3/18/15), 160 So. 3d 609, *writ denied*, 15-0788 (La. 3/14/16), 189 So. 3d 1065. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. *Id*. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence. *Id*.

Relevant to this case, second-degree murder is "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to

13

act.  La. R.S. 14:10(1).  Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434.  Specific intent to kill may also be inferred from the extent and severity of the victim's injuries. *State v. Bull*, 53,470 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1175, *writ denied*, 20-00797 (La. 12/22/20), 307 So. 3d 1040.  Furthermore, the discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person.  *State v. Dooley*, 38,763 (La. App. 2 Cir. 9/22/04), 882 So. 2d 731, *writ denied*, 04-2645 (La. 2/18/05), 896 So. 2d 30.

While there was no one who said they actually saw defendant pull the trigger, the circumstantial evidence was so overwhelming that the jury was able to find defendant guilty beyond a reasonable doubt of second-degree murder.  There was ample eyewitness testimony that defendant entered the Central Gas Station with Ms. Qualls, that the two of them went to the women's bathroom area, that screaming and gunshots were heard from the women's bathroom area, that defendant left the store alone before driving away in Ms. Qualls' vehicle, and that defendant then fled on foot from police officers after having been pulled over.

The jury also saw the surveillance video from the Central Gas Station which supported the witness testimony.  Furthermore, defendant's specific intent can be inferred from the fact that Ms. Qualls was shot three times in the head from a very close range.  We find the evidence incriminating defendant compelling such that it excludes every reasonable hypothesis of defendant's innocence.  Accordingly, this assignment of error is without merit.

Appellant asserts that the trial court's denial of his motion to suppress the introduction of a single booking photo used for purposes of in-court identification constituted an abuse of discretion. Appellant argues that the use of such a photo at trial was unduly suggestive and presented a substantial likelihood of misidentification. Appellant asserts that not only are single photographs (as opposed to a multiple photo "lineup") highly suggestive, this suggestiveness is exacerbated when the source is a booking photo. Defendant argues that since the trial court abused its discretion in admitting an impermissibly suggestive photo, a new trial is warranted.

The state argues that the trial court did not err in granting the state's motion *in limine* and denying defendant's motion to suppress because defendant's appearance drastically changed over a five-year period, thus it was necessary to introduce the booking photo so that witnesses would be able to identify the person they saw at the time of the incident. The state argues that the introduction of defendant's booking photograph was properly admitted under the three-part test for determining the admissibility of mugshots outlined in *United States v. Carillo*, *supra*.

To suppress an identification, the defendant must prove the procedure used was suggestive and that the totality of the circumstances presented a substantial likelihood of misidentification. *State v. Sparks*, 88-0017 (La. 5/11/11), 68 So. 3d 435, *cert. denied*, 566 U.S. 908, 132 S. Ct. 1794, 182 L. Ed. 2d 621 (2012); *State v. Martin*, 595 So. 2d 592 (La. 1992); *State v. West*, 561 So. 2d 808 (La. App. 2 Cir. 1990), *writ denied*, 566 So. 2d 983 (La. 1990). Even if suggestiveness is proven by the defendant, it is the likelihood of misidentification, and not the mere existence of suggestiveness, which

violates due process. *State v. Holmes*, 05-1248 (La. App. 4 Cir. 5/10/06), 931 So. 2d 1157.

The trial court found that the state's use of defendant's booking photograph for purposes of in-court identification was not unduly suggestive. A trial judge's determination on the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. *State v. Bickham*, 404 So. 2d 929 (La. 1981). In *United States v. Carillo*, *supra*, the U.S. Fifth Circuit used a three-part test for determining the admissibility of mugshots: (1) the government must have a demonstrable need to introduce the photographs; (2) the photographs must not imply that the defendant has a criminal record; and (3) the manner of introduction at trial must not draw attention to the source or implications of the photographs.

The first part of the three-part test from *Carillo* requires the government to have a demonstrable need to introduce the booking photograph. In this case, the state demonstrated this need by showing the degree to which defendant's appearance had changed since the time of the offense. In the five years since the incident, defendant had gone from a big, burly, hairy individual to a thin, bald, shaved one. The witnesses saw and would remember defendant as he appeared on the day of the incident. After comparing defendant's booking photograph with how he appeared at trial, the trial court was persuaded of the need to introduce the booking photograph. Since defendant's appearance had changed so drastically since the time of the offense, the state demonstrated its need to introduce his booking photograph.

The second part of the *Carillo* test mandates that the photograph not imply that the defendant has a criminal record. In this case, there is nothing out of the ordinary about defendant's booking photograph. It appears to be a regular photograph with a standard blue background commonly used in government-issued identification documents, such as driver's licenses or passports.

In *United States v. Torres-Flores*, 827 F. 2d 1031 (5th Cir. 1987), the U.S. Fifth Circuit concluded the jury could have realized that the photo was a mugshot where the measuring tape was visible in the background and the government "inartfully" taped over the police notes on the bottom on the photo. Here, however, no measuring tape or police notes were visible. Simply put, the photo was that of a standard picture from which no implications or assumptions could be made in viewing it.

The third part of the *Carillo* tripartite test requires that the manner of introduction of the photo not draw attention to the source or implications of the photo. During the trial, the photo was shown to one lay witness, Shendra Briggs, and one law enforcement officer, Trooper Justin Stevenson. The testimony of each is as follows:

From Ms. Briggs:

Q. What's this photograph, what's this a photograph of?

A. Isaac, Isaac Gee.

Q. And does this picture depict how you saw him?

A. Yes.

Q. Like in August 2016?

A. That's the way he looked.

Q. And is this the picture of the same individual that's sitting over

17

there right now?

A. Yes ma'am.

From Trooper Stevenson:

Q. I want to show you what's being offered and introduced as State's Exhibit 1. Can you identify that photograph?

A. Yes ma'am.

Q. Is that how he appeared on the day he was taken into custody?

A. Yes ma'am, the same individual.

It is difficult to see how any implications can be drawn from this line of questioning other than that the picture showed defendant as he appeared at the time of the incident. Moreover, the manner of introduction of the photo did not draw attention to the source or any implications of the photo. Accordingly, the state satisfied the test under *Carillo* for admitting the booking photograph into evidence. The photograph was not unduly suggestive nor did it create a substantial likelihood of misidentification. Given the importance of the evidence and the success in disguising the source, the trial court did not abuse its discretion in admitting the photograph, and we see no grounds for a new trial by virtue of its admittance.

## CONCLUSION

For the foregoing reasons, defendant's conviction and sentence are affirmed.

**AFFIRMED.**